UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

04-20883

CASE NO.

INTERNACIONAL DE DESARROLLO, S.A.,
a Venezuelan corporation,

    Plaintiff,

CIV - JORDAN

v.

BURGER KING CORPORATION,
a Florida corporation,

    Defendants.

_____

## COMPLAINT AND JURY DEMAND

Plaintiff, INTERNACIONAL DE DESARROLLO, S.A. ("IDSA"), by its attorneys, sues Defendant, BURGER KING CORPORATION ("BKC"), and alleges as follows:

### I.   NATURE OF THE ACTION

1. This is a civil action seeking, among other things, compensatory and exemplary damages in excess of $75,000, arising from BKC's fraudulent misrepresentations in order to induce IDSA to execute an agreement to renew its role as an authorized supplier to Burger King® restaurants in Venezuela. BKC made the material misrepresentations to IDSA for the express purpose of convincing IDSA to continue supplying its Venezuelan franchisee with food products needed for operations during a period when its franchisee was outfitting its own supply plant with BKC's knowledge and approval.

2. Plaintiff, INTERNACIONAL DE DESARROLLO, S.A. ("IDSA"), is a corporation organized and existing under the laws of Venezuela. At all times material hereto, IDSA has been an approved provider and/or supplier of food products for Burger King®

1



franchises. IDSA has been an approved provider and/or supplier of food products for Burger King® franchises for over 22 years, and from approximately 1996 until June, 2002, IDSA was the only approved provider and/or supplier in Venezuela. During the period 1980 to 1996, IDSA was the only approved provider and/or supplier in Venezuela that was consistently able to maintain such a designation for a period of 1 year or longer.

3. Defendant, BURGER KING CORPORATION ("BKC") is a corporation organized and existing under the laws of the State of Florida, and maintaining its principal place of business in Miami-Dade County, Florida.

## II. JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over these claims based upon the diversity of citizenship of the parties. Venue is proper in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(c), because all or a substantial part of the acts, omissions and events giving rise to Plaintiff's claims occurred in the Southern District of Florida.

## III. GENERAL FACTUAL ALLEGATIONS

5. By way of background, IDSA was approached by BKC in 1980 in order for IDSA to potentially become a processor and producer of frozen poultry products for sale to the BKC franchisee in Venezuela. At that time, the sole BKC franchisee in Venezueula was Servicios de Comidas Rapidas, C.A. ("SERCRA"), which at the time was part of the Organizacion Diego Cisneros ("ODC"), a Venezuelan conglomerate owning multiple businesses.

6. SERCRA had initially intended to supply its BKC franchises through producers and suppliers that were corporate affiliates of SERCRA. However, SERCRA's affiliates were unable to meet BKC's exacting quality control standards, resulting in BKC seeking non-affiliated producers and suppliers. Consequently, in order to protect the quality of its products, and to insure adherence to its quality control standards, BKC prohibited its Venezuelan

2

franchisee from self-supplying food and other products. In 1980, then, IDSA was authorized as a supplier of frozen poultry products for BKC franchisees in Venezuela.

7.     Indeed, since 1980, IDSA has been the only supplier to BKC franchisees that has continued to meet BKC quality standards, and over the ensuing years, IDSA added frozen potato products, and ultimately beef patties to its line of authorized BKC products, which also included among other items apple pies and onion rings. During the ensuing 19 years, IDSA continued to supply SERCRA's Burger King franchises with food products manufactured, prepared and packaged in accordance with both the exacting BKC quality standards, and in accordance with BKC policies and procedures.

8.     However, during the latter part of this time period, the growth of SERCRA's Burger King franchise business became stagnant, with no new stores opening since the mid-1990's, and SERCRA's ownership, ODC, began looking to sell the Venezuelan Burger King Franchise. At that time, ODC/SERCRA had twelve (12) Burger King® outlets in Venezuela.

9.     In fact, in the late 1990's, IDSA expressed interest to BKC in possibly acquiring the Venezuelan Burger King Franchise from ODC. BKC, however, was reluctant to allow IDSA to become the franchisee, citing *inter alia*, its policy of no longer allowing the Venezuelan franchisee to self-supply its own food products, which would have been a problem as IDSA was for all intents and purposes the only approved BKC supplier in Venezuela at that time.

10.    A short time later, in 1998, IDSA learned that BKC was engaging in negotiations to allow the sale of SERCRA—including the Venezuelan Burger King Franchise—to a corporate group belonging to Antonio Gorrin ("Gorrin"). Gorrin owns many businesses in Venezuela, including franchises for Papa John's® Pizza and Subway®. Gorrin also owns many businesses in Florida, including Don Pan® bakeries, and Paris-Croissant, Inc.

11. Upon learning of the potential sale of the BKC Venezuelan franchise to Gorrin, IDSA became extremely concerned. It was well known that Gorrin and his group of companies self-supplied food and other products to their other franchise operations. Moreover, Gorrin had a reputation of having poor credit relationships with suppliers, and was known for trying to undercut those same suppliers in the marketplace. As such, IDSA was reluctant to enter into any business relationship with any Gorrin-controlled entities.

12. Coincidently, at about the same time, BKC was in discussions with IDSA to renew its status with BKC as an Approved Supplier to Burger King® franchises. During these discussions, BKC for the first time sought a written contract with IDSA. BKC also insisted that IDSA acquire additional equipment in order to produce the various Burger King food products, including but not limited to an Anyl-Ray fat analyzer, a Wolfking meet grinder, and a Formax meet processor/patty former, despite the fact that IDSA was continuing to produce Burger King food products up to BKC specifications and standards without the use of the new equipment.

13. Given Gorrin's history of self-supplying its own franchises, and Gorrin's negative credit reputation, IDSA was reluctant to enter into an agreement with BKC to act as and approved BKC supplier to Gorrin, especially when you take into account the required capital expenditure by IDSA in acquiring the additional equipment which was to cost in excess of $286,281 U.S.

14. IDSA raised its concerns with BKC. In response, Edward Sabatini ("Sabatini") BKC's Quality Manager and Manager in Charge of Supplier Approvals for Latin America, told IDSA not to worry, that such self-supply by Gorrin would never happen because the franchise agreement between BKC and Gorrin prohibited it. BKC also expressed that they had previously

had a bad experience with the ODC/SERCRA supplying itself and BKC was not going to repeat the errors of the past.

15. Additionally, BKC executives assured IDSA that the sale of the Venezuelan Burger King Franchise to the Gorrin Group would be mutually beneficial to all, as Gorrin had promised to aggressively promote and expand the BKC franchise in Venezuela, opening new outlets. The BKC executives assured IDSA that this would benefit everyone as BKC would collect more franchise fees, and IDSA would sell more products.

16. In reliance upon the assurances of the various BKC executives, in mid-1999, IDSA entered into a written supplier agreement with BKC, and proceeded to acquire the new equipment required by BKC at a cost of over $286,281.00.

17. Also in mid-1999, Desarrollos Bikey, S.A. ("DBK"), an entity controlled by Gorrin, became the new BKC franchisee by acquiring SERCRA (and its existing retail outlets)(collectively referred to hereafter as DBK/SERCRA). DBK then developed new restaurants at the same time it was remodeling the existing SERCRA outlets. It was during this time that DBK/SERCRA began to spin off individual restaurant outlets into new single-purpose entities, all under the control of Gorrin and DBK/SERCRA.

18. Relying upon the express representations of BKC executives noted above, IDSA began supplying DBK/SERCRA. Initially, IDSA—based upon DBK/SERCRA's promise to pay invoices within the specified term—reduced its prices by ten percent over those previously charged to ODC/SERCRA. However, throughout the period between 1999-2002, Gorrin and DBK/SERCRA were continually complaining that IDSA prices were too high. IDSA responded that due to DBK/SERCRA's poor payment history, and the effect of the currency exchange risk

5

upon IDSA, among other factors, it was impossible to give discounts to DBK/SERCRA, unless they made payments to IDSA within the agreed upon 30 day term.

19. In December 2000, Gorrin told IDSA that his intention when he bought the BKC franchise was to ultimately self-supply, that he would be opening his own factory, and that IDSA had been a fool for not acquiring the BKC franchises. IDSA immediately raised this issue with BKC, and was again reassured that BKC would never allow its Venezuelan franchisee to self-supply. In fact, Sabatini continued to reinforce BKC's representation that no Gorrin affiliated plant would be permitted, explicitly stating to IDSA that as long as he was with BKC no plant controlled by Gorrin or his affiliates would ever become an approved BKC supplier/provider. This was reiterated at subsequent meetings in Miami, Florida, involving Sabatini and BKC's in-house counsel, Werner Glass.

20. Moreover, IDSA was assured by BKC that the corporate bylaws of all the Venezuelan Burger King franchise entities allowed BKC to exercise extensive control over its franchisees.

21. Indeed, in all the bylaws of these corporations, BKC is extensively referenced. Indeed, when IDSA expressed reservations about continuing to do business with DBK, BKC officials reassured IDSA telling its officers that it would continue to exercise considerable control over the Venezuelan franchisee by virtue of the powers granted to them in the franchise agreement and by the restrictions in the corporate documents of the franchisee entities.

22. In fact, the Articles of Incorporation of all of Gorrin's BKC franchise entities require BKC's written approval of any transfer or encumbrance of the shares of the company. Additionally, these Articles of Incorporation also required BKC's written approval of the President of the company, so long as it remained a BKC franchise, and contained a clause stating

6

that the president of each of the franchise entities is given the legal and total control over the operations of that company, always following the guidelines, policies and procedures of BKC and may take whatever action is necessary in order to assure the compliance with the requirements of the Franchise Agreement with BKC.

23. These material representations reassured IDSA that the conduct of the franchise would always be in accordance with BKC standards, and that BKC's guidelines, policies and procedures, which expressly prohibited a franchisee from supplying itself with required BKC products, would be adhered to. Based upon these representations IDSA continued to supply DBK/SERCRA, despite increasing problems collecting its accounts receivables.

24. As IDSA's collection problems with DBK/SERCRA mounted, IDSA pursued multiple meetings with BKC. In April 2002, IDSA met with Julio Ramirez, President of Latin American Operations for BKC, and Armando Hernandez (Latin American franchise manager for BKC) at the Hotel Melia in Caracas, Venezuela. By that time Gorrin had already announced to IDSA that he intended to try to self supply. DBK/SERCRA was delinquent in their payments to IDSA and the receivables were mounting. As a result, IDSA informed Ramirez that DBK/SERCRA owed IDSA a substantial sum of money and given Gorrin's statement that they were trying to open their own plant, IDSA was worried that if they did so, IDSA receivables would not be paid and IDSA's inventory in BKC products would be wasted.

25. Indeed, IDSA informed BKC that it would sever the relationship with DBK/SERCRA at that time, no longer supplying the Burger King outlets in Venezuela, and would begin to pursue collection of its receivables. IDSA advised BKC that it was concerned that if it continued to supply DBK/SERCRA without some assurance of payment and that the Gorrin-affiliated plant was not going to be approved, that IDSA believed that not only would it

not receive payment for the existing receivables, but that the amount of IDSA unpaid invoices would increase.

26.     At this meeting, Ramirez told IDSA that he was aware of DBK/SERCRA's mode of operation, but, that at least they opened many new stores, and not to worry.  Ramirez then requested that IDSA provide BKC with sales and receivables information for all the Venezuelan Burger King outlets, and he stated he would use that information to help IDSA get paid.

27.     Ramirez also told IDSA to continue to supply DBK/SERCRA, to put stores that were more than 30 days on COD, and to continue to sell to the other stores the regular way. Ramirez also stated that because of the potential conflict of interest between a franchisee and a controlled supplying entity, and the franchise agreement's terms which prohibited such a relationship, BKC would not approve the plant Gorrin was threatening to open.

28.     Upon information and belief, DBK/SERCRA used the allegations that IDSA's prices were too high as an excuse to try to obtain approval of his plant so he could self-supply his outlets.  Moreover, upon information and belief, DBK/SERCRA also contended to BKC that if it made more money from operations, as a result of lower costs by self-supplying), then DBK/SERCRA would have more resources and capital to expand the franchise and increase the number of BK outlets.  This would directly result in additional license, royalty and franchise fees for BKC.

29.     Indeed, given the months-long preparation involved in approving a new supplier plant—which occurred in June 2002—BKC had had discussions with DBK/SERCRA about going forward with approval of such a plant at or before the same time that it was representing to IDSA that no such Gorrin-affiliated would ever be approved.

30.     In April 2002, BKC was interested in getting IDSA to continue to supply, because the new plant was not yet ready. This would—until the DBK affiliated plant was operational—allow the franchises to continue to operate and would allow BKC to continue to receive franchisee fees pending transition to the DBK affiliated plant.

31.     In fact, based upon BKC's repeated representations that no Gorrin/DBK/SERCRA affiliated plant would ever be approved, and that BKC would intercede on IDSA's behalf to secure payment of the existing receivables, IDSA continued to supply DBK/SERCRA. But for BKC's assurances and representations, IDSA would have suspended sales to DBK/SERCRA in April 2002.

32.     Instead of receiving payment of the then existing receivables -- with the exception of those outlets that had been placed on COD status – the opposite occurred and the receivables due from DBK/SERCRA continued to grow. In the interim, BKC allowed Gorrin to proceed to establish Processadora de Carne Burger House, C.A. ("BURGER HOUSE"), an affiliate of DBK/SERCRA, for the express purpose of replacing IDSA as the supplier of frozen chicken, meat patties and other products, including apple pies and onion rings.

33.     Indeed, in late June 2002, IDSA learned that BKC had in fact approved Gorrin's plant, and at that point DBK/SERCRA ceased to continue purchasing from IDSA. IDSA also subsequently learned that not only had BKC personnel approved the plant, but that they had also traveled to Venezuela for weeks leading up to the approval, without notice to IDSA, in order to train BURGER HOUSE personnel on the production according to BKC standards of the very same food products IDSA was selling DBK/SERCRA.

34.     When DBK/SERCRA ceased to purchase from IDSA, IDSA instantly lost between 25 to 30 percent of its total sales. Coupled at the same time, with an outstanding

unpaid receivable from DBK/SERCRA of approximately $794,530.00, IDSA was placed in a position where it lacked sufficient capital and cash flow to even properly service its other non-DBK/SERCRA customers, resulting in substantial lost sales.

35. Additionally, IDSA was faced with in excess of $337,000 worth of inventory, which by agreement could only be sold to Burger King® restaurants, but which the only BKC franchisee in Venezuela refused to purchase. Moreover, despite demand from IDSA, BKC refused to re-purchase IDSA's unsold inventory. Consequently, the inventory spoiled and had to be destroyed.

36. Thus, while on the one hand reassuring IDSA that no plant would be approved, in order to induce IDSA to continue to supply the Venezuelan Burger King outlets, and allow them to remain open and operating, BKC was conspiring with Gorrin and DBK/SERCRA to allow DBK/SERCRA to self-supply themselves with the very food products IDSA was selling, all with the intention of increasing BKC's license, royalty and franchise fees from the Venezuelan operations. In fact, in the short time that DBK/SERCRA had been the franchisee, the number of Burger King® outlets in Venezuela increased by fifty percent, to a total of eighteen restaurants.

37. After being confronted by IDSA, BKC ultimately stated that it could not interfere in a collection matter between IDSA and DBK/SERCRA, despite the fact that BKC had previously specifically represented that it would do so, in order to induce IDSA to continue to supply the Venezuelan Burger King outlets.

**COUNT I (Fraud in the Inducement)**

38. Plaintiff realleges paragraphs 1 through 37 as if fully set forth herein.

39. In 1998, prior to IDSA entering into its Agreement with BKC, defendant BKC repeatedly represented to IDSA that it would never allow the new BKC Venezuelan franchisee to

self-supply because the franchise agreement between BKC and Gorrin prohibited it. BKC also expressed that they had previously had a bad experience with the ODC/SERCRA, and was not going to repeat the errors of the past. Further, BKC explicitly represented to IDSA that no plant controlled by Gorrin or his affiliates would ever become an approved BKC supplier/provider.

40. The representations made by Defendant BKC are now, and when made were, false and BKC knew them to be false at the time that they were made. BKC made the representations intending to induce IDSA to enter into the contract to continue to act as a supplier/provider of Burger King® outlets in Venezuela, and to induce IDSA into expending several hundreds of thousands of dollars of capital expenditures on new equipment which would not have been needed unless IDSA entered into the written agreement with BKC. In doing so, BKC sought to lure IDSA into continuing its supply of BKC outlets in Venezuela knowing full well that Gorrin was preparing to open his own supply operation and knowing full well that Gorrin needed additional time before that plant would be operational.

41. IDSA entered into the contract in reliance on the false representations made by BKC and had IDSA known that the representations were false it would not have entered into the contract.

42. In entering into the contract, IDSA was not aware of the falsity of the representations made by BKC, reasonably believed the representations to be true, and could not have discovered their falsity by the exercise of reasonable diligence.

43. As a result of IDSA being fraudulently induced by BKC to enter into the Supplier Agreement, IDSA has been damaged.

WHEREFORE, Plaintiff demands judgment against the Defendant for damages, costs, pre-judgment interest and such further and other relief as this Court deems just and proper.

## COUNT II (Fraud)

44. Plaintiff realleges paragraphs 1 through 37 as if fully set forth herein.

45. BKC, its officers, employees and/or its agents acting on its express instructions, made material misrepresentations and omitted to disclose material facts to IDSA in order to induce IDSA to continue to supply Venezuelan Burger King outlets, with the intent of allowing the outlets to remain open (generating license, royalty and franchise fees to BKC) while BKC conspired with Gorrin/DBK/SERCRA to complete establishment of BURGER HOUSE in order to replace IDSA as the supplier of frozen chicken, meat patties and other food products.

46. BKC had a duty to disclose to IDSA that it was moving forward with approval a DBK/SERCRA affiliated supplier, as it had superior knowledge of the facts, and they had specifically represented to IDSA that no such plant would ever be permitted.

47. IDSA justifiably relied on the Defendant's representations and omissions to its detriment and has been damaged as a result of its reliance, and as a result of the fraud.

WHEREFORE, Plaintiff demands judgment against the Defendant for damages, costs, pre-judgment interest and such further and other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff IDSA, S.A. demands a trial by jury on all issues so triable.

Respectfully submitted,

RODRIGUEZ & MACHADO, P.A.
Attorneys for Plaintiff IDSA, S.A.
101 Madeira Avenue
Coral Gables, Florida 33134
Telephone:   (305) 377-1000
Telefax:       (305) 377-1055

By: _____
Juan J. Rodriguez, Esq.
Florida Bar No. 613843
Email: jrodriguez@rodriguezmachado.com
Albert J. Xiques, Esq.
Florida Bar No. 948217
Email: axiques@rodriguezmachado.com

## **Verification**

Pursuant to the provisions of 28 USC § 1746, the undersigned JOSE LEOPOLDO BURG, the principal shareholder of IDSA, S.A., the plaintiff herein, declares under penalty of perjury under the laws of the United States that the foregoing allegations of the complaint are true and correct to the best of my knowledge, information and/or belief.

Dated this 13th day of April, 2004.

_____
Jose Leopoldo Burg

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET 04-20883

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Internacional de Desarrollo, S.A.,

**DEFENDANTS**

Burger King Corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF: Venezuelan Corp.
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT: Miami-Dade County, Florida
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Dade 04-20883 CIV AJ

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Albert J. Xiques, Esq., Rodriguez & Machado, P.A.
101 Madeira Avenue, Coral Gables, FL 33134
(305) 377-1000

ATTORNEYS (IF KNOWN)
MAGISTRATE JUDGE BROWN

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: (DADE,) MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☒4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☒3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☒ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☒ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | A☐ 871 IRS - Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. 1332 (diversity); Claims for fraud in the inducement, and other fraud

LENGTH OF TRIAL
via 1 days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $** TBD, but in excess of $1,417,811

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S)** (See instructions):
IF ANY
JUDGE _____ DOCKET NUMBER _____

DATE: April 14, 2004

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____